# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

## Case No. 26-60288

---

**Hayam El Gamal, et al.,**
**Petitioners,**

**v.**

**Todd Blanche**
**Acting U.S. Attorney General,**

**Respondent.**

---

## EMERGENCY MOTION FOR STAY OF IMMINENT REMOVAL PENDING RESOLUTION OF PETITION FOR REVIEW

## CUSTODY STATUS: DETAINED

---

Eric Lee
Mich. Bar No. P80058
Christopher Godshall-Bennett
D.C. Bar. No. 1780920
LEE & GODSHALL-BENNETT LLP
712 H St. NE, Unit 5019
Washington, D.C. 20002
Tel: (202) 949-2526
Fax: (202) 333-6470
eric@leegodshallbennett.com
chris@leegodshallbennett.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case:

Lee & Godshall-Bennett, LLP

Board of Immigration Appeals

Board of Immigration Appeals Judge Sirce Owen

Immigration Judge Veronica Segovia

Immigration Judge Justin Adams

ATTORNEY OF RECORD:

/s/ Eric Lee
Eric Lee
Counsel for Petitioners

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

NATURE OF THE RELIEF REQUESTED............................................................... 1

STATEMENT OF FACTS AND OF THE CASE ...................................................... 2

    I.    Background, Initial Arrest, and Expedited Removal Attempt....................... 2

    II.   Removal and Bond Proceedings ................................................................. 4

    III.   First Amended Petition for Writ of Habeas Corpus...................................11

    IV.   Ms. El Gamal's Medical Emergency and Denial of Care........................ 13

    V.   Magistrate Judge Recommends Release; Executive Branch Demands BIA Dismiss Appeal of Removal Order ..................................................................... 14

LEGAL STANDARD.............................................................................................. 18

ARGUMENT ......................................................................................................... 18

    I.    Petitioners Are Likely to Succeed on the Merits......................................... 19

        A.   The BIA's Summary Dismissal Violates the Accardi Doctrine ............... 19

            1.   Executive Branch Political Leadership Improperly Influenced the BIA's Adjudication of Petitioners' Appeal, Violating Supreme Court Precedent and the Statutory Framework Guiding the Immigration Court System.............. 19

            2.   Federal Regulations and the BIA Practice Manual Prohibit the Executive Branch Political Leadership from Influencing Immigration Proceedings ... 22

            3.   The BIA's Summary Dismissal Violates Several Recent Policy Memos 24

            4.   The BIA's Summary Dismissal Violates BIA Precedent Indicating that this Precise Type of Political Interference Is Unacceptable......................... 27

        B.   The BIA Summary Dismissal Violates Clear Fifth Circuit Precedent...... 28

            1.   The Only Case the Board Cites to Support its Summary Dismissal, *Rioja v. Ashcroft*, Fatally Undermines its Legitimacy Because Petitioners Timely Explained Why They Did Not File the Merits Brief by April 6................... 28

            2.   This Court Squarely Held in *Morales-Morales* and the BIA Itself Has Repeatedly Held that Dismissal Without Merits Adjudication Is Not Appropriate When Based on a Non-Prejudicial Clerical Error.................... 31

            3.   The BIA Practice Manual Makes Clear that Summary Dismissal Is Not Appropriate Where a First Motion to Extend Briefing Schedule is Timely Filed............................................................................................................ 36

C.   Removing Petitioners Without Any Merits Review of Their Claims to Relief from Deportation Would Violate Their Rights Under the Fifth Amendment's Due Process Clause ................................................................... 37

D.   Petitioners Plan to Raise Additional Arguments When this Court Issues a Briefing Schedule, and Petitioners Should Not Be Removed Before the Parties Are Able to Brief the Issues ................................................................ 40

II.   Petitioners Will Be Irreparably Injured Absent a Stay ................................ 40

III.  The Issuance of a Stay Will Not Substantially Injury Respondent nor Be Contrary to the Public Interest ........................................................... 42

CERTIFICATE OF SERVICE............................................................ 44

CERTIFICATE OF CONFERENCE.................................................... 45

CERTIFICATE OF COMPLIANCE .................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ................................................................. 38

*Boddie v. Connecticut,* 401 U.S. 371 (1971) ........................................................... 37

*Chike v. I.N.S.*, 948 F.2d 961 (5th Cir. 1991) ....................................................... 38, 39

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985) .................................. 37

*Dvortsin (as Next Friend) v. Noem*, No. 25-CV-01741-NYW, 2025 WL 1751968 (D. Colo. June 12, 2025) ......................................................................................... 21

*Haitian Refugee Ctr. v. Smith,* 676 F.2d 1023 (5th Cir. 1982) ................................ 38

*Heffernan v. City of Patterson, N.J.*, 578 U.S. 266 (2016) ..................................... 33

*Hernandez–Garza v. I.N.S.,* 882 F.2d 945 (5th Cir. 1989) ..................................... 37

*Ibarra-Pinedo v. Ashcroft*, 37 F. App'x 88 (5th Cir. 2002) .................................... 32

*In Re Jorge Tadeo Carrera Hernandez,* 21 I. & N. Dec. 224 (BIA 1996) ............ 34

*In Re: Jean Volgly Carson Remy*, No. : AXX XX9 270, 2003 WL 23508719 (BIA Dec. 8, 2003) ........................................................................................................... 34

*In Re: Jose Pedro Reyes-Frisby*, No. : AXX XX3 446, 2006 WL 3203510 (BIA Oct. 2, 2006) .............................................................................................................. 34

*Izen v. Commissioner of Internal Revenue*, 38 F.4th 459 (5th Cir. 2022) ............... 35

*Ka Fung Chan v. INS,* 634 F.2d 248 (5th Cir. 1981) ............................................... 39

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ........................................... 38

*Magnussen v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001) .......................... 35

*Marcello v. Bonds*, 349 U.S. 302 (1955) ................................................................. 20

*Maredia v. Gonzales*, 232 F. App'x 413 (5th Cir. 2007) ........................................ 33

*Maredia v. Gonzales*, 232 Fed. App'x. 413 (5th Cir. 2007) ................................... 35

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................. 38

*Matter of De Lucia*, 11 I. & N. Dec. 565 (BIA 1966) ............................................ 27

*Matter of Hernandez-Puente*, 20 I. & N. Dec. 335 (BIA 1991) ............................. 27

*Matter of Hussein Jama Ibrahim*, No. AXXX-XX7-653, WL 5921044 (BIA Sept. 27, 2018) ................................................................................................................... 33

*Matter of Rosales Vargas & Rosales Rosales*, 27 I. & N. Dec. 745 (BIA 2020)... 34

*Miller v. Stanmore*, 636 F.2d 986 (5th Cir. 1981).................................................... 35

*Morales-Morales v. Barr*, 933 F.3d 456 (5th Cir. 2019) ................................. 31, 32

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950) ................... 37

*Nat'l Imm. Project v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720 (S.D.N.Y. 2012) ................................................................................................................... 42

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................. 18, 40, 41, 42

*Rioja v. Ashcroft,* 317 F.3d 514 (5th Cir. 2003)............................................... 28, 29

*Rodriguez Galicia v. Gonzales*, 422 F.3d 529 (7th Cir. 2005).............................. 37

*See In Re Mu Yong Henry*, No.: AXX XX2 072, 2003 WL 23508663 (BIA Dec. 24, 2003) ............................................................................................................. 33

*Taylor v. Astrue*, 706 F.3d 600 (5th Cir. 2012) ...................................................... 35

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ................ 19, 20

**Statutes**

8 U.S.C. § 1229a(b)(4) ............................................................................................ 37

**Regulations**

8 C.F.R. § 1003.1(d)(1)............................................................................................ 22

8 C.F.R. § 1003.3(a)(1)............................................................................................ 32

8 C.F.R. § 1240.1(c) ............................................................................................... 37

8 C.F.R. §1003.1(d)(1)(iii)....................................................................................... 22

## NATURE OF THE RELIEF REQUESTED

**Petitioners re-submit this recently filed Motion for Stay of Removal as an Emergency Motion for Stay of Imminent Removal. Roughly an hour after the original motion was filed, Immigration and Customs Enforcement detained Petitioners in Colorado at their first scheduled check-in following their release from custody on April 23, 2026, indicating that they would be imminently removed.**

On Thursday, April 23, 2026, Petitioners Hayam El Gamal and her five children, aged 5, 5, 9, 16 and 18, filed a timely Petition for Review of a decision by the Board of Immigration Appeals (BIA), which dismissed their appeal of an Immigration Judge's (IJ) decision. Ms. El Gamal and her children file this motion for a stay of removal, under Fed. R. App. P. 27 and 5th Cir. R. 27.3.1. Neither Ms. El Gamal nor her children have any criminal history, and each was in Immigration and Customs Enforcement (ICE) custody from June 3, 2025, until April 23, 2026. On the latter date, the U.S. District Court for the Western District of Texas ordered the family released at a hearing that took place earlier that day. Respondents released the family several hours later.

However, because counsel for the government argued in the April 23, 2026 district court hearing that the family remains detainable, and because of the highly irregular actions that the government has taken against Petitioners since the date of

1

their arrest and detention, a stay of their removal is proper. Counsel for ICE's Office of the Principal Legal Advisor informed the undersigned on Friday evening, April 24, that he could not confirm or deny whether ICE would attempt to re-detain the family at a check-in that will be held at ICE's Denver Field Office at 10 A.M. Central Time on April 25th. This motion is being filed before the April 25th check-in takes place. If ICE re-detains the family during the check-in, the undersigned will file a subsequent motion to treat this stay motion as an emergency stay motion, while complying with the Circuit Court's rules on emergency motions.

This family satisfies all factors requisite to granting a stay.

## STATEMENT OF FACTS AND OF THE CASE

### I. Background, Initial Arrest, and Expedited Removal Attempt

Hayam El Gamal and her five children are citizens of Egypt. They entered the United States legally in August 2022 and subsequently overstayed their visas awaiting determinations on their affirmative asylum applications. The family was taken into custody on June 3, 2025, in retribution for the activity of their ex-husband/father, Mohamed Soliman. Mr. Soliman threw Molotov cocktails at demonstrators attending a march in support of Israeli hostages in Boulder, Colorado,

2

on June 1, 2025, resulting in twelve people being injured and an elderly individual being killed. ECF No. 42-1, at 3.[1]

The family was arrested on June 3, 2025. The official Twitter/X account for the White House made several posts that day about the "capture" of "the wife and five children" of Mohamed Soliman, stating that the family was "in ICE custody for expedited removal" and stating "six one-way tickets for Mohamed's wife and five kids. Final boarding call coming soon." *Dvortsin (as Next Friend) v. Noem*, No. 25-CV-01741-NYW, 2025 WL 1751968, at *1 (D. Colo. June 12, 2025). Petitioners filed a Motion for Temporary Restraining Order requesting the government be restrained from subjecting the family to expedited removal in violation of the statutory bar on expedited removal for individuals like Petitioners who had resided in the U.S. for two years or more. The U.S. District Court for the District of Colorado ruled:

> Petitioner presented evidence that Ms. El Gamal and her children have resided in the United States for over two years. For that reason alone, it would seem that Respondents could not legally place them in expedited removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (conditioning the Attorney General's ability to apply expedited removal procedures to non-arriving noncitizens on those noncitizens' having been present in the United States for under two years); *see also* 8 C.F.R. § 235.3(b)(1)(2) (providing that expedited removal

---

[1] The Administrative Record in this case has not yet been filed. Therefore, for consistency and simplicity purposes, citations in this motion are to the record in their Petition for a Writ of Habeas Corpus, *El Gamal et al. v. Noem et al.*, 25-cv-1261-FB-ESC (W.D. Tex.).

3

> proceedings may only be applied to "arriving aliens" and "as specifically designated by the Commissioner, aliens who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility"). Yet the Government expressly stated that this was what it was doing-per the White House, ICE "captured" Ms. El Gamal and her children and was detaining them "for expedited removal" as early as the night of June 3, 2025.

*Id.* at *2. The Court further noted that "[t]he Government brief does not disavow the White House's earlier pronouncements that it intends to attempt expedited removal or remove Ms. El Gamal and her children immediately despite apparently recognizing that such processes would not comport with due process." *Id.* at *2 n.7. Petitioners were then transferred to Texas and placed in removal proceedings.

## II.    Removal and Bond Proceedings

Petitioners requested and received a bond hearing on September 12, 2025. ECF No. 42-1, at 3. The IJ issued a decision on September 19, 2025, granting Petitioners a $15,000 bond. *Id.* at 2. At the bond hearing, the Department of Homeland Security (DHS) argued that Ms. El Gamal and her 18-year-old daughter, Ms. Soliman, were subject to mandatory detention because they were the wife and adult child of a person inadmissible for having engaged in terrorist activity pursuant to 8 U.S.C. § 1182(a)(3)(B). *Id.* at 3. The IJ rejected this argument and determined Ms. El Gamal and Ms. Soliman were not subject to mandatory detention because

4

they fell under at least one exception to § 1182(a)(3)(B), because of their lack of knowledge of or involvement in the attack by Mr. Soliman; their cooperation with law enforcement; and their renunciation of Mr. Soliman's conduct. *Id.* at 4-6.

The IJ then considered whether Petitioners should nonetheless be detained due to being a danger to the community or a flight risk. *Id.* at 6. DHS conceded Petitioners were not a danger to the community but argued Petitioners were a flight risk due to the weakness of their asylum claim and based on DHS' concerns that the apartment in which Petitioners were to live was not "habitable" and that their community sponsors were not "valid, reliable, and credible." *Id.* Petitioners effectively rebutted those assertions with letters and financial documents from the joint sponsors indicating their willingness and ability to sponsor Petitioners, evidencing that Petitioners would have a fixed address in the U.S. upon release. *Id.* at 6-7. The IJ found that a $15,000 bond was sufficient to mitigate any flight risk and to ensure Petitioners appear at all future hearings. *Id.* at 7.

ICE immediately filed a Notice of Intent to Appeal Custody Redetermination and invoked an automatic stay of the IJ's bond order under 8 C.F.R. § 1003.19(i)(2). ECF No. 42-2, at 2-7. ICE filed its Notice of Appeal with the BIA on October 2, 2025, arguing that the exceptions to mandatory detention identified by the IJ did not apply to Ms. El Gamal and that she was a flight risk. *Id.*

On October 6, 2025, Ms. El Gamal, Ms. Soliman, and the four minor children

5

filed their Petition for habeas relief in the District Court for the Western District of Texas, along with a motion for a temporary restraining order ("TRO"), challenging the constitutionality of the automatic stay provision of 8 C.F.R. § 1003.19(i)(2) and their continued detention. While the TRO motion was pending, DHS pursued an alternative basis for a stay of the bond decision by moving for an emergency discretionary stay of the IJ order under 8 C.F.R. § 1003.19(i)(1). ECF No. 15, at 3.

On November 18, 2025, the District Court granted Petitioner's motion for a TRO, finding that Petitioners were likely to succeed on the merits of their Petition as to the unconstitutionality of the automatic stay; vacated the automatic stay of the IJ's bond decision as unconstitutional; and ordered Petitioners' release from custody upon payment of the $15,000 bond. *Id.* at 11. However, the District Court stayed its order vacating the automatic stay and ordering Petitioners' release for a period of 14 days while the BIA considered the Government's request for a discretionary stay. *Id.* The District Court further ordered that, if no emergency stay was obtained by December 2, 2025, the stay would be dissolved, and Petitioners would be permitted to post bond and be released in accordance with the IJ's bond order. *Id.*

The BIA, however, granted DHS' motion for an emergency discretionary stay of the IJ bond order on November 6, 2025, before the District Court issued the TRO. ECF No. 16-1, at 2. On November 28, 2025, the BIA remanded Petitioners' case for further bond proceedings on the applicability of the exceptions to mandatory

6

detention, which resulted in the dissolution of the discretionary stay, the previous IJ's bond decision being vacated, and the TRO expiring. ECF No. 22, at 1-3; ECF No. 34-1, at 1-7.

An IJ held a merits hearing in Petitioners' removal proceedings on December 29, 2025,[2] and the IJ pretermitted their asylum applications and ordered Petitioners removed without reviewing the merits on the basis that Petitioners had "abandoned" the asylum applications. ECF No. 27, at 1; ECF No. 29, at 1; ECF No. 36-2, at 1–5.

Petitioners filed a notice of appeal with the BIA on January 2, 2026. ECF No. 27, at 1. Petitioners have strong asylum claims based, inter alia, on the high profile nature of the U.S. government's false insinuations that they knew or may have known about their father's terrorist activity, the fact that their ex-husband/father's family desires to harm them because they renounced their father, which is culturally unacceptable, as well as based on female genital mutilation for two of the children.

The Notice of Appeal supplement stated "[t]he immigration judge committed reversible error in finding that questions on the I-589 were 'incomplete' and therefore, deficient, when they were not." Exh B.[3]

---

[2] The Immigration Clinic at Texas A&M University School of Law agreed to represent Petitioners in their removal proceedings but could not begin work until school resumed in January; the IJ would not agree to a continuance, and Petitioners were required to represent themselves *pro se* in those proceedings. ECF No. 26, at 1.

[3] In the Notice of Appeal, Petitioners argued that they did not "abandon" their applications for asylum. They pointed out that the IJ asserted that Respondents left Question 4 on their asylum application unanswered by failing to provide the exact dates of prior trips to their country of origin. But exact dates is not an explicit requirement of answering that question, "the dates of the trips"

The same IJ from the original bond hearing conducted three hearings in the remanded bond proceedings, concluding on January 21, 2026. ECF No. 24, at 1; ECF No. 42-3, at 2-8. Despite relying on the substantially identical evidentiary record upon which the IJ previously found Petitioners not to be a flight risk, the IJ denied bond. ECF No. 42-3, at 2-8. The IJ again found that Petitioners were not subject to the terrorism-related ground of inadmissibility but found that Ms. El Gamal posed a significant flight risk and that no bond amount would ensure her appearance at future hearings. *Id.* at 3. The IJ's brief written opinion on this issue stated that he based his decision on (1) Ms. Gamal's lack of property and assets in the United States; (2) her lack of family ties in the United States; (3) her length of time in the United States; (4) and the denial of her application for asylum and withholding of protection. *Id.* The IJ applied the same reasoning to each of Ms. El Gamal's children to determine that each child, independently, posed a significant flight risk such that no bond amount would ensure their appearance at future hearings

---

is listed after "for example," meaning they are a suggestion and not a mandatory requirement. The family did not remember the exact dates of prior trips but provided as much information as they had. They do not have access to their personal electronic devices in detention and so were not able to access the exact dates of their trips. The omission would not have been material to their claim or the sufficiency of their application and could easily have been addressed by asking Respondents to supply any details. They also argued that the IJ committed reversible error in providing no meaningful opportunity to address the specific questions she asserted were unanswered, despite multiple attempts by the Respondents asking her to do just that. For example, the Lead Respondent begged the IJ: "If you ask me now I will answer." The IJ said: "You can't just leave questions blank," but the family did not leave any questions blank. The IJ's determination that the I-589 was deficient required that she provide Respondents with notice and a meaningful opportunity to correct any deficiencies. Exh. B. at 3-4.

either. *Id.*

Petitioners did not appeal the unfavorable custody determination due to concerns about futility at the BIA—concerns which have been confirmed by recent events. Instead, they moved for a new bond hearing based on new material evidence relating to bond eligibility. ECF Nos. 54, 54-1, 55-5. This evidence included information addressing the IJ's concerns in his January 21, 2026 bond denial. Petitioners submitted evidence showing that Ms. El Gamal's community supporters had raised over $110,000 for the family to address the IJ's concerns about her lack of property and assets. Petitioners also submitted evidence showing that Petitioners' cousin had been detained by DHS on multiple occasions since Petitioners' detention and questioned extensively about why he had taken actions to support Petitioners in their immigration case. ECF No. 55-5, at 2. This information showed that DHS was unlawfully intimidating witnesses who would have been able to show that Petitioners had family ties in the United States, and that the only reason her U.S. citizen relatives did not provide declarations or testify in Petitioners' bond proceedings was because they had been intimidated by DHS. *Id*. at 3. Petitioners also provided evidence that they had acquired a state court order determining that the father had "abandoned" the children rendering them eligible to receive green cards through Special Immigrant Juvenile Status (SIJS) and as proof that applications for SIJS (Form I-360) had been filed, as well as evidence showing Ms.

9

El Gamal had applied for a T-visa as a victim of trafficking, given that her abusive husband had brought her and her children to the United States without their approval or input. *Id*. at 4.

DHS filed a brief opposing the motion for a subsequent bond hearing and the same IJ who granted and then denied bond denied the motion shortly after DHS filed its opposition. ECF No. 58-1, at 1. The denial notice is only a page-and-a-half long. *Id.* Regarding the $111,000 the family had, the notice states that "[t]he fact that the family now has more money in the bank is not a material change of circumstance" because the Court was referring to "physical assets" and not liquid assets. *Id*. at 2. As to the intimidation by DHS of Ms. El Gamal's cousin, which impacted the IJ's prior bond denial based in part on lack of family ties, the IJ stated that "the circumstances surrounding the cousin, whatever they may be, certainly do not constitute a material change of circumstance." *Id*. As to the evidence that Ms. El Gamal and her family had received an outpouring of community support, the IJ held, "[t]he fact that the [Petitioners] have now obtained additional signatures from the community members does not establish a material change of circumstances." *Id*. Finally, as to the evidence the family submitted that they had applied for SIJS for the children and a T-visa for Ms. El Gamal, the IJ said "[t]he fact that the [Petitioners] have filed the applications is not a material change of circumstances" either. *Id*.

10

### III.    First Amended Petition for Writ of Habeas Corpus

Petitioners filed a First Amended Verified Petition for Writ of Habeas Corpus with the district court on February 17, 2026, ECF No. 42, asserting two claims for relief.  The first claim asserted a violation of procedural due process based on the IJ's allocation of the burden of proof on Petitioners to show a lack of danger to the community and a lack of flight risk. The second claim asserted that Respondents had unconstitutionally separated Ms. Soliman (age 18) from her mother and siblings as punishment for her speaking to the media about her detention and the conditions at the Dilley facility.

In its brief responding to the Amended Petition, DHS submitted a declaration from Assistant Field Office Director Marie De Leon stating that Ms. Soliman had been separated merely because she had turned 18-years-old. ECF No. 46-1. However, the timing made it undeniably clear that ICE separated her in retribution for speaking out.

Ms. Soliman turned 18 on June 8, 2025, four days after she and her family arrived at the detention center. Ms. Soliman had provided necessary assistance to her mother in taking care of the children, especially the three youngest, now aged 5, 5 and 9, who have experienced acute trauma throughout their detention, including

11

bed-wetting, panic attacks, and nightmares.[4] In its 10:00 P.M. newscast on the evening of January 19, 2026, CBS News Colorado ran an eight-minute segment that featured Ms. Soliman protesting her family's conditions of detention.[5] *The day after CBS published the article*, *ICE headquarters in Washington D.C.* called Dilley to urgently demand Ms. Soliman be separated from her family. ECF No. 46-1 ¶ 28. Two days later, the Deputy Assistant Director of ICE's Juvenile Family Management Division (JFMD) called personally to follow up, *mentioning Ms. Soliman by name*: "The Deputy Assistant Director of JFMD noted that SOLIMAN remained on the family unit side of the facility and asked that she be moved to the appropriate facility." *Id.* ¶ 29. Dilley officials then separated Ms. Soliman from her family.

Petitioners likewise submitted evidence to the District Court that on or about January 24, 2026, ICE Officers Gutierrez and Consuegra informed Petitioners' counsel that the family would be separated if they "misbehaved," ECF No. 41 at 1,

---

[4] Lomi Kriel, *"Slowly Killing Us on the Inside": A Family of 6 at Texas' Dilley ICE Detention Center Begs for Freedom*, Tex. Trib. (Mar. 11, 2026, 5:00 AM CT), https://www.texastribune.org/2026/03/11/el-gamal-texas-egyptian-family-dilley-health-care-food-ice-detention-letters-children/.

[5] Alan Gionet, *Family of Accused Colorado Firebombing Attacker Still in ICE Custody 7 Months Later; Supporters Call for Release*, CBS News Colo. (Updated Jan. 27, 2026, 3:26 PM MST), https://www.cbsnews.com/colorado/news/wife-children-accused-boulder-attacker-immigration-detention/. The story was updated on January 27 but was originally published as a written article online (with the video from the January 19 newscast) on January 20, 2026. See https://web.archive.org/web/20260121074925/https://www.cbsnews.com/colorado/news/wife-children-accused-boulder-attacker-immigration-detention/.

and that on February 17, 2026, an ICE officer told Ms. El Gamal, "If you keep asking and arguing about this [Ms. Soliman's separation], they will move your daughter to another facility that is 300 miles away and you will only get to call her for an hour once every two weeks." ECF No. 43 at 1. The government's threadbare attempt to present the separation of Ms. Soliman as a "technical" matter was further addressed by Petitioners in the Reply Brief submitted to the U.S. District Court for the Western District of Texas. ECF No. 50, at 8-10.

## IV.    Ms. El Gamal's Medical Emergency and Denial of Care

On April 10, Ms. El Gamal suffered a serious medical emergency that required her hospitalization. She had been denied medical attention for over six weeks regarding a mass on her chest, until finally on April 10, 2026, she experienced excruciating pain that resulted in her being taken to an off-site emergency room. ECF No. 57, at 1–2; El Gamal Decl. ECF No. 57-1 ¶¶ 2-6. The ER doctor performed a CT scan, which was inconclusive as to the lump in her chest but found trace pericardial effusion—fluid around her heart—and recommended an ultrasound, but the recommendation was denied. ECF No. 57, at 2-3; El Gamal Decl. ECF No. 57-1 ¶ 7; ER Records ECF No. 57-2, at 2; Zeidan Decl. ECF No. 57-3 ¶ 5. There is concern Ms. El Gamal might have cancer or a systemic autoimmune disease requiring urgent diagnosis and treatment. Zeidan Decl. ECF No. 57-3 ¶ 6; Reddy Decl. ECF No. 57-3 ¶ 19. These circumstances resulted in the minor children

13

remaining in the detention center without a parent or other adult family member while Ms. El Gamal received emergency treatment, because the children's 18-year-old sister, Ms. Soliman, had been separated from them months before due to her speaking to the press regarding conditions at Dilley.  ECF No. 42 ¶ 66.

## V.    Magistrate Judge Recommends Release; Executive Branch Demands BIA Dismiss Appeal of Removal Order

On Monday, April 20th, a Magistrate Judge in the U.S. District Court for the Western District of Texas issued a Report and Recommendation granting the family's Petition for a Writ of Habeas Corpus and recommending release. ECF No. 59.

The Report and Recommendation found that the government's detention of the family violated the Due Process Clause and ordered them released. ECF No. 59. Analyzing the family's detention under the framework elaborated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Magistrate Judge held "that Petitioners' private interest in their liberty is compelling; the Government's interest is comparatively slight; and the risk of error flowing from placing the burden on Petitioners to prove a negative is significant." ECF No. 59-, at 21. The Magistrate Judge ordered release based on "the specific circumstances of this case," *id.*, noting that "[t]he Government has intervened in this case repeatedly and aggressively from its inception . . . which has significantly contributed to the reality of Petitioners' prolonged detention." *Id.* at 22-23. The Magistrate Judge held that "it appears that

14

the dice were loaded from the beginning," explaining:

> The record establishes that the Government has engaged in procedural maneuvers aimed at thwarting the possibility of Petitioners' discretionary release from the moment they were taken into custody. It is unquestionable that Petitioners have been targeted by the Government due to their connection to an individual allegedly responsible for a terrorist act despite the fact that there has never been any evidentiary finding that Petitioners themselves were affiliated with that act or even had knowledge of its occurrence. The very same day Petitioners were taken into custody in connection with Mr. Soliman's alleged terrorist activity, President Trump posted on social media that Petitioners "COULD BE DEPORTED AS EARLY AS TONIGHT." Thirty minutes later, he again posted: "Six One-Way Tickets for Mohamed's Wife and Five Kids. Final Boarding Call Coming Soon." Immediate deportation is, of course, impossible under federal law, and the posts reflect both disregard for the due-process protections Petitioners are guaranteed and the targeting of Petitioners for potentially punitive and political purposes.

*Id*. at 26.

The Magistrate Judge continued, explaining:

> When the IJ assigned to evaluate Petitioners' eligibility for bond found that they were not subject to mandatory detention under Section 1226(c), were not a danger to the community, were not a flight risk, and ordered release, the Government acted swiftly to invoke an automatic stay of the IJ's bond decision, despite numerous courts across the country finding that the automatic-stay provision, 8 U.S.C. § 1003.19(i)(2), is unconstitutional.

*Id*. at 27. The Magistrate Judge further held that it was "[e]qually as concerning"

that "the very same IJ who originally found Petitioners *not* to be a flight risk

15

subsequently reversed his decision on a nearly identical record of evidence on the flight-risk factors." *Id*. Even before Petitioners filed the Emergency Motion warning that the BIA was being pressured by executive branch political leadership to dismiss the family's appeal, the Magistrate Judge held that "there is some evidence before the Court that suggests the Government improperly interfered in the subsequent custody hearings, too." *Id*. at 28. The Magistrate then explained that "despite the IJ's finding of a *lack* of danger or risk of flight, since that time and at every subsequent step of this case, the Government has relentlessly sought to detain Petitioners through targeted procedural maneuvers and the intimidation of Petitioners' family and community." *Id*. at 29. The Magistrate Judge determined that "a third bond hearing would be an inadequate remedy to ensure due process is preserved" given "the significant risks that the Government will intervene to again target Petitioners' case and prevent their lawful release." *Id*. at 30. The Magistrate Judge concluded that "[i]mmediate release is the appropriate remedy."

The District Court set a hearing for Thursday April 23, 2026, to take objections from the parties as to the Magistrate's Report and Recommendation. ECF No. 60.

At 12:07 p.m. central time on Wednesday, April 22, as Petitioners' counsel were traveling by airplane to San Antonio to attend Thursday's hearing, the undersigned was informed by a credible, former Department of Justice employee

16

that a current executive branch employee (who the former Department of Justice employee stated was credible) had been informed that political leadership in Washington, D.C., ordered the BIA to issue a decision in the then-pending removal case appeal before the District Court's April 23rd hearing. ECF No. 62. Petitioners immediately moved the District Court to stay their removal and order their release in light of this information. *Id.* at 3-4.

Shortly after the emergency motion was filed, two additional events transpired. First, the District Court granted the Emergency Motion in part, prohibiting the government from removing Petitioners from the United States or the Western District of Texas. ECF No. 64. Second, the BIA issued an order summarily dismissing Petitioners' December 30, 2025 appeal of the removal order. ECF No. 65-1. The dismissal order consisted of ***one paragraph*** and was signed by only one BIA member (Judge Sirce Owen). It did not address any of the arguments presented by Petitioners, instead claiming the appeal must be summarily dismissed because Petitioners Motion to Extend the Briefing Schedule, though filed "on that date" (*i.e.* in a timely manner by the deadline). *Id*. at 2, n.1. Judge Owen did not assert that the Motion to Extend was untimely, instead noting that it was "rejected by the board for filing deficiencies." *Id*.

The next day, the District Court held a hearing in San Antonio, Texas and, over the government's objections, ordered Petitioners released immediately. The

17

government moved orally for a stay of the District Court's order and the District Court denied the motion. The government failed to release Petitioners for roughly 6 hours from the time the District Court orally ordered Petitioners released. Upon release, Petitioners ultimately were given an ICE check-in interview scheduled in Denver for Saturday, April 25 at 11 A.M. Central Time (10 A.M. Mountain Time).

## LEGAL STANDARD

Granting a motion for stay of removal requires satisfaction of four factors: (1) the petition for review is likely to succeed; (2) the applicant will be irreparably injured absent a stay; (3) issuance of the stay will not substantially injure the other parties interested in the proceeding; and (4) the public interest favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). *Nken* explains that the first two factors are "most critical." *Id.* at 434. The last two factors merge because the government is the respondent. *Id.* at 435. While "not a matter of right," courts may grant stays in the "exercise of judicial discretion" based on "the circumstances of the particular case." *Id*. at 433 (internal quotations and citation omitted).

## ARGUMENT

Petitioners are entitled to a stay because (1) they are likely to succeed on the merits of their petition for review; (2) they will be irreparably injured absent a stay; and (3)-(4) the issuance of the stay will not injure the Government but will instead serve the public interest.

18

## I.  Petitioners Are Likely to Succeed on the Merits

Ms. El Gamal and her children's petition is likely to succeed. In fact, the BIA's summary dismissal order quite clearly violates Fifth Circuit precedent and its own policies and practices. The petition is therefore not merely *likely* to succeed, but almost certain to succeed.

The government must not be allowed to continue its long track record of treating Petitioners in an unlawful manner by removing them from the United States before this Court can adjudicate the merits of the Petition for Review.[6]

### A. The BIA's Summary Dismissal Violates the Accardi Doctrine

1. Executive Branch Political Leadership Improperly Influenced the BIA's Adjudication of Petitioners' Appeal, Violating Supreme Court Precedent and the Statutory Framework Guiding the Immigration Court System

The one-member Board decision summarily dismissing Petitioners' appeal violates clear Supreme Court precedent.

In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), the Supreme Court dealt with a situation even more benign than the instant case. The Court explained that the petitioner there admitted he was removable, but "the petitioner alleged, among other things, that the denial of his application by the Board

---

[6] Internal Government e-mails produced after *Nken* show there is no "policy and practice" of returning individuals who prevail on a petition for review. *Id.* at 726-30.

of Immigration Appeals was prejudged through the issuance by the Attorney General in 1952, prior to the Board's decision, of a confidential list of 'unsavory characters' including petitioner's name, which made it impossible for him 'to secure fair consideration of this case.'" *Id*. at 261-62. The Court struck down the Board's decision, explaining that the Attorney General's decision to include the non-citizen on this "list" was "precisely what the regulations forbid him to do: dictating the Board's decision." *Id*. at 267.

The Court explained: "[I]f the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience." *Id*. at 267. The Supreme Court stated that it "object[ed] to the Board's alleged failure to exercise its own discretion, contrary to existing valid regulations." *Id*. at 268. The Court held that the BIA must "arrive[] at its decisions" by "exercis[ing] its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right." *Id*. Soon after deciding *Accardi*, the Court decided a case with similar facts, determining that "[t]he Attorney General cannot, under present regulations, dictate the actions of the Board of Immigration Appeals." *Marcello v. Bonds*, 349 U.S. 302, 311 (1955). If that rule applies to the Attorney General, who is statutorily charged with overseeing the Executive Office for Immigration Review, it must apply with even greater force when the political

20

leadership outside of the Justice Department such as the White House intervenes to dictate to the Board how *and when* it must rule on an appeal.

The facts here are more egregious than the conduct in *Accardi* and *Marcello.* Here, Petitioners were not placed on a general list of one hundred individuals as in *Accardi*, they were instead singularly targeted by the White House, which previously tried to subject them to expedited removal in blatant disregard of the statutory framework established by Congress. The official Twitter/X account for the White House made several posts on June 3, 2025, about the "capture" of "the wife and five children" of Mohamed Soliman, stating that the family was "in ICE custody for expedited removal" and stating "six one-way tickets for Mohamed's wife and five kids. Final boarding call coming soon." *Dvortsin (as Next Friend) v. Noem*, No. 25-CV-01741-NYW, 2025 WL 1751968, at *1 (D. Colo. June 12, 2025). Petitioners' removal was only halted by the intervention of the U.S. District Court for the District of Colorado. *Id.* Subsequently, after Petitioners were moved from Colorado to the Dilley detention facility in Texas, the executive branch then subjected the family to the automatic stay provision and unconstitutionally detained them for roughly two months. ECF No. 15. Then they separated the eldest daughter from the family the day after a news article appeared in which she criticized the conditions of her confinement. ECF No. 50 at 8-10. Then they attempted to intervene to block the Article III courts from conducting a hearing on the family's release. A current

21

executive branch employee found this to be so unpalatable that they felt they had an ethical obligation to inform Petitioners. Since the Supreme Court decided *Accardi*, there has perhaps never been a fact pattern that so clearly calls for the application of the Court's ruling that the executive branch may not dictate outcomes of Board decisions.

2. Federal Regulations and the BIA Practice Manual Prohibit the Executive Branch Political Leadership from Influencing Immigration Proceedings

The Code of Federal Regulations clearly prohibit the Board from bowing to pressure from the White House in impacting its decision-making process, let alone dictating the outcome of its decisions, as the facts indicate happened here.

The Regulations state: "The Board shall resolve the questions before it in a manner that is timely, *impartial*, and consistent with the Act and regulations." 8 C.F.R. § 1003.1(d)(1) (emphasis added). The regulations also state that "Board members shall exercise their *independent* judgment and discretion in considering and determining the cases coming before the Board" 8 C.F.R. §1003.1(d)(1)(iii) (emphasis added). Likewise, the Board's own Practice Manual clearly prohibits the Board from allowing pressure from the White House to influence its decision-making process.

These principles are enshrined in the first chapter of the Board's practice manual. In fact, the section laying out the "role" of the Board notes: "Role . . . The

Board is tasked with resolving the questions before it in a manner that is timely, *impartial*, and consistent with the Immigration and Nationality Act and regulations . . ..” Chapter 1.2(a) (emphasis added). Chapter 1.2(d) states: “Relation to DHS. The Department of Homeland Security was created in 2002 and assumed most of the responsibilities of the now abolished Immigration and Naturalization Service (INS). DHS is responsible for the enforcement of the immigration laws and the administration of immigration and naturalization benefits. In contrast, the Board and the Immigration Courts are responsible for the independent adjudication of cases under the immigration and nationality laws. Thus, DHS is entirely separate from the Department of Justice and is deemed a party when appearing before the Board or an Immigration Court.” Chapter 1.2(d).

Petitioners provided the U.S. District Court for the Western District of Texas information from a credible source in the executive branch indicating that the White House was demanding the Board dismiss their pending appeal in their removal case before a federal court could conduct a hearing as to whether the family should be released or not. ECF No. 62 at 1. Within hours, this information proved correct, and the Board issued a one-paragraph, one-judge decision that (a) failed to provide a meaningful legal rationale, (b) failed to address the arguments and citations to Fifth Circuit and BIA caselaw that Petitioners referenced in their briefing, ECF No. 56-1, (c) misstated the rule from the only case it cited, and (d) violated its own Practice

Manual. ECF No. 65-1. During the April 23 hearing before the U.S. District Court for the Western District of Texas, counsel for the government admitted that the circumstances supported an inference of impropriety.[7]

3. The BIA's Summary Dismissal Violates Several Recent Policy Memos

The Executive Office for Immigration Review has repeatedly and systematically repudiated exactly the type of behavior engaged in by the one-judge panel that issued the April 22 decision summarily dismissing Petitioners' appeal.

On January 19, 2021, EOIR Director James R. McHenry III issued a directive—PM-21-15—entitled "Adjudicator Independence and Impartiality."[8] The memo states: "Notwithstanding an oft-repeated myth to the contrary, all adjudicators at EOIR are independent in their decision-making in the cases before them . . . Consequently, no employee or officer can direct an adjudicator to rule in a particular way on a matter before him or her in the first instance." The memo states: "public clamor, partisan inquiries, pressure from outside groups, or pressure from other employees or officers are all inappropriate considerations for selecting adjudicators, they are all just as inappropriate for adjudicators to consider when making decisions." Further, "EOIR adjudicators exercise independent decision making in

---

[7] Petitioners requested a transcript of the April 23 hearing on Friday, April 24. The undersigned was present in court for the hearing and will provide citations to the transcript within days, as soon as they become available.

[8] Exec. Office for Immigration Review, Policy Memorandum PM 21-15, Adjudicator Independence and Impartiality (Jan. 19, 2021).

accordance with the law, and to support and reinforce that independence, it remains EOIR policy that adjudicator decisions should continue to be based solely on the record before the adjudicator and the applicable law," and "It is not the role of an adjudicator to provide preferential treatment to one party over another or to provide a procedural advantage to one party at the expense of another." And "[P]rinciples of independence and impartiality may also bear upon the appropriateness of corrective action or discipline for an adjudicator. For example, an adjudicator who abandons neutrality in order to favor one party over the other may be subject to corrective action or discipline, especially if the adjudicator does so in defiance of applicable law."

On August 16, 2019, Director McHenry issued a policy memo entitled "Allegations of Misconduct by EOIR Adjudicators and Ex Parte Communications."[9] The memo notes:

> EOIR expects all of its adjudicators, including immigration judges, members of the Board of Immigration Appeals, and administrative law judges, to adhere to the highest standards of ethical conduct and professionalism and to maintain impartiality in order to ensure public confidence regarding proceedings before the agency. Such conduct includes the general avoidance of ex parte communications, defined as contact between an adjudicator presiding over a proceeding and one party to

---

[9] Exec. Office for Immigration Review, Policy Memorandum PM 19-14, Allegations of Misconduct by EOIR Adjudicators and Ex Parte Communications (Aug. 16, 2019), https://www.justice.gov/eoir/page/file/1196341/dl.

the proceeding during which the opposing part is not present or included.

The August 16, 2019 memo further explains that "EOIR expects both adjudicators and parties to its proceedings to comport themselves with professionalism and integrity. It expects adjudicators to act in a neutral and detached manner, to be faithful to the law and to maintain professional competence in it, and to refrain from giving preferential treatment to any organization or individual when adjudicating cases."

It is notable that the single BIA judge who signed the summary dismissal order at issue here is Judge Sirce Owen, who on August 22, 2025, while serving as Acting Director of EOIR, issued a policy memo entitled "Adjudicator Independence and Impartiality," PM 25-42.[10] This policy memo notes that Immigration Judges and BIA members are:

> required to adjudicate cases independently and impartially without favor to either party or without deciding them on any basis other than the record before them and the applicable law. Relatedly, and notwithstanding an oft-repeated myth to the contrary, all adjudicators at EOIR are independent in their decision making in the cases before them. In other words, they exercise "independent judgment and discretion" when adjudicating cases. See, e.g., 8 C.F.R. §§ 1003.0(c), 1003.1(d)(1)(ii), 1003.10(b); accord *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954).

---

[10] Exec. Office for Immigration Review, Policy Memorandum PM 25-42, Adjudicator Independence and Impartiality (Aug. 22, 2025), https://www.justice.gov/eoir/media/1411796/dl.

Judge Owen then affirmed the applicability of the language in PM 21-15 noting that "pressure from outside groups, or pressure from other employees or officers are all inappropriate factors for adjudicators to consider when making decisions" and that "it remains EOIR policy that adjudicator decisions should continue to be based solely on the record before the adjudicator and the applicable law" and not on outside influence. These are precisely the principles that Judge Owen has violated by agreeing to sign the order that the political leadership of the executive branch evidently pressured her to sign.

4.  <u>The BIA's Summary Dismissal Violates BIA Precedent Indicating that this Precise Type of Political Interference Is Unacceptable</u>

In an earlier period, the BIA itself determined that claims that immigration proceedings are the product of unlawful prejudgment can succeed where there is substantial evidence that executive branch political leadership has put its fingers on the scales of the proceedings in question.

> We reject the claim of prejudgment in the instant case for the reason that respondent has failed to introduce any substantial evidence that the incumbent Attorney General or the incumbent Commissioner of Immigration and Naturalization has issued an expressed or implied directive to rule adversely on the respondent's applications for discretionary relief.

*Matter of De Lucia*, 11 I. & N. Dec. 565, 568 (BIA 1966). The language is significant in that it indicates that even an *implied directive* is sufficient to reverse a Board decision when supported by substantial evidence. Likewise, "in considering and

27

determining cases before [them, the Board] can only exercise such discretion and authority conferred . . . by law." *Matter of Hernandez-Puente*, 20 I. & N. Dec. 335, 339 (BIA 1991).

Here, a current executive branch employee with clearly credible knowledge of the Board's deliberation process (as evidenced by the fact that exactly what the employee said was imminent took place roughly two hours later) indicated that the political leadership in the executive branch issued an *explicit directive to dismiss Petitioners' appeal*. Not only did the current employee indicate that the executive branch political leadership was dictating what the outcome would be, the employee also indicated that the political leadership was directing that the decision must come within hours so that it would pre-empt the federal court hearing scheduled for the next day. The BIA decision that was ultimately published was slipshod, contained no analysis or serious legal argument, and indicated that it was published at the last minute. Indeed, the decision was published on the EOIR online filing system just minutes before the close of business, and hours before the hearing scheduled for the following morning would commence.

B. *The BIA Summary Dismissal Violates Clear Fifth Circuit Precedent*

1. The Only Case the Board Cites to Support its Summary Dismissal, *Rioja v. Ashcroft*, Fatally Undermines its Legitimacy Because Petitioners Timely Explained Why They Did Not File the Merits Brief by April 6

The only case the Board cites in its one-judge, one-paragraph summary dismissal order is *Rioja v. Ashcroft,* 317 F.3d 514 (5th Cir. 2003), which fatally undermines its own order. In *Rioja*, this Court upheld a summary dismissal order that complied with the federal regulations' authorization of summary dismissal where two conditions exist: First, that a non-citizen indicates "that he or she will file a brief or statement in support of the appeal and, thereafter, does not file such brief or statement," and second, that the non-citizen also does not "reasonably explain his or her failure to do so, within the time set for filing." *Id*. at 515. The Court based its ruling on the fact that the non-citizen had not made any reasonable attempt to explain his lack of filing a brief "within the time set for filing." It explained that the pertinent regulation "specifically allows for lenity to an appellant who, within the filing deadline, reasonably explains his or her failure to file the promised brief or statement" and ruled against the non-citizen because "[d]espite the lengthy period of time between the withdrawal of his counsel and the summary dismissal of his appeal, Rioja failed to seek any such relief." *Id.*

Here, Petitioners unquestionably provided a reasonable explanation for their first motion to extend the briefing schedule. They filed a motion to extend the briefing schedule by the deadline set by the Board which the government acknowledged was "timely-filed." ECF No. 55, at 1. In that motion Petitioners were not required to provide a reason for the extension request given longstanding Board

29

policy that first motions to extend briefing schedule are granted as a matter of policy, regardless of the reason. BIA Practice Manual, Chapter 4(c)(1)(B) (noting "It is the Board's policy to grant one briefing extension per case, if requested in a timely fashion" as here). Regardless, Petitioners' counsel *did* provide a reason: that roughly a week-and-a-half before the briefing schedule due date, an assassination attempt against another client was unexpectedly revealed by the Federal Bureau of Investigation, requiring the undersigned to travel immediately from Michigan to New York City to conduct a series of meetings with officials and attorneys to guarantee the safety of that client. ECF No. 55-1.  In addition, in Petitioners' Reply to the government's motion for summary dismissal, Petitioners explained: "In an abundance of caution, counsel also intends to file concurrently a Motion to Accept Untimely Filing[11], including new, previously unsubmitted evidence demonstrating [Petitioners'] diligence and the extraordinary circumstances warranting equitable tolling of the appeal brief deadline." ECF No. 56-1. At the time the Board summarily dismissed the appeal, counsel for Petitioners was working diligently on both the merits brief as well as the brief providing additional facts to support equitable tolling of the deadline and was days away from filing.[12]

---

[11] The initial motion to extend the briefing schedule was not untimely, as the government concedes. ECF No. 55.

[12] Even if their brief were somehow erroneously construed as "untimely," (and here DHS concedes that Ms. El Gamal's motion to extend the briefing schedule was timely filed), in the family's pending federal habeas case, DHS missed multiple deadlines without cause. The U.S. District Court for the Western District of Texas nevertheless declined to construe filings as "unopposed"

The Board violated this Court's ruling in *Rioja* by ordering summary dismissal even though Petitioners (a) provided an explanation for their timely-filed motion to extend the briefing schedule beyond what was required by longstanding Board practice of granting the first briefing extension request, and (b) had explained to the Board that they were in the process of providing additional briefing.

     2.   This Court Squarely Held in *Morales-Morales* and the BIA Itself Has Repeatedly Held that Dismissal Without Merits Adjudication Is Not Appropriate When Based on a Non-Prejudicial Clerical Error

---

due to these missed deadlines. It would constitute a gross miscarriage of justice to penalize the El Gamal family for a clerical error on a timely filing when DHS has missed deadlines in the federal case and did not face any consequences. For instance, in December 2025, DHS requested that the undersigned agree to extend the briefing schedule. The undersigned agreed, and the parties filed a joint motion to that effect. *El Gamal v. Mullin*, 25-cv-1261-FB, ECF No. 21 (Joint Motion to Extend Scheduling Order Deadlines). DHS made a second request to extend the briefing schedule in January 2026, and the parties filed another joint motion to that effect on January 2, 2026. *El Gamal v. Mullin*, 25-cv-1261-FB, ECF No. 28 (Joint Motion to Extend Scheduling Order Deadlines). On January 9, 2026, DHS missed a deadline to respond to Ms. El Gamal's Petition for a Writ of Habeas Corpus. The District Court issued an Order to Show Cause noting that the government "failed to file a response to the Petition by the January 9 deadline, nor have they filed a motion to extend time," implying multiple missed deadlines. ECF No. 31 at 2. The District Court accordingly ordered "that Respondents [DHS] show cause for their failure to comply with the January 9 deadline set forth in the Court's prior order." *Id*. Counsel for DHS submitted a new motion to extend time which acknowledged that although "Petitioner's counsel agreed to deadlines" extensions multiple times, counsel for DHS "mistakenly" failed to file the third motion to extend the briefing schedule and "did not realize the omission" until the Court ordered an explanation. ECF No. 32. As a result of missing the deadline, DHS had technically failed to respond to the family's habeas petition. Nevertheless, the District Court granted DHS's late motion to extend the briefing schedule on January 21, 2026. *El Gamal v. Mullin*, 25-cv-1261-FB (Text Order) (W.D. Tx. Jan. 21, 2026). Given this recent case history, it would constitute a gross miscarriage of justice to penalize Ms. El Gamal and her children for a timely filed, first motion to extend the briefing schedule that did not include a certificate of service noting that service is not required because all parties use ECAS.

31

The Board and Fifth Circuit have ***repeatedly and consistently rejected DHS' argument*** that a clerical error regarding the certificate of service can serve as the basis for dismissal without reaching the merits of the appeal. And the government acknowledged that the motion to extend the briefing schedule was "timely" in a Joint Status Report filed in Petitioners' habeas case. ECF No. 55, at 1.

This Court squarely addressed this question in *Morales-Morales v. Barr*, 933 F.3d 456 (5th Cir. 2019). There, a unanimous panel consisting of Judges Higginbotham, Smith, and Southwick concluded that the Board "rejected [the non-citizen's] argument that the appeal should be dismissed because the government failed to sign a proof of service." *Id*. at 461. The non-citizen appealed this element of the Board's decision and the Fifth Circuit, through Judge Southwick, affirmed.

The Circuit Court noted that "[t]here is some fairly stringent language about proof of service in the regulations governing appeals to the BIA," quoting 8 C.F.R. § 1003.3(a)(1): "The appeal must reflect proof of service of a copy of the appeal and all attachments on the opposing party." 933 F.3d at 462. The Fifth Circuit explained in *Morales-Morales* that "the practice manual expressly states that it 'does not carry the weight of law or regulation.' [BIA Practice Manual] § 1.1(c)." 933 F.3d at 463. The Court referenced what it called "the BIA's practice" of treating faults with certificates of service as procedural issues upon which merits decisions cannot be based. *Id.* Additionally, the Court explained that the individual raising the argument

32

"did not show prejudice" because she plainly received notice of the government's filing, as evidenced by her filing a brief responding to the service issue. *Id*.

In related situations, this Court has also consistently held that technical regulatory deficiencies in the immigration context cannot be outcome determinative without a demonstration of prejudice. Here the government unquestionably had notice of the motion to extend the briefing schedule, as evidenced by their filing. *See Ibarra-Pinedo v. Ashcroft*, 37 F. App'x 88, 88 (5th Cir. 2002) (service deficiency irrelevant because opposing party "had actual notice, i.e., the failure to comply with the regulation caused Ibarra–Pinedo no prejudice."); *Maredia v. Gonzales*, 232 F. App'x 413, 417 (5th Cir. 2007) (a "challenge regarding the technical procedural defects attendant to" removal proceedings "fails because [the party] has not made an initial showing of substantial prejudice.").[13]

The Board has repeatedly ruled along these lines. In 2018, the Board addressed a parallel situation where *a DHS attorney* failed to properly include a certificate of service in a brief. The Board held that technical service deficiencies are "procedural errors" and that such deficiencies should not result in dismissal absent actual prejudice. *Matter of Hussein Jama Ibrahim*, No. AXXX-XX7-653, WL

---

[13] The common law principle of symmetry in application of rules to both parties means that the Board cannot interpret clerical errors by non-citizens as outcome-determinative when it has regularly held that such errors cannot be outcome-determinative against DHS. As the U.S. Supreme Court has noted, principles must be applied equally to differently situated parties. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Patterson, N.J.*, 578 U.S. 266, 272 (2016).

5921044 (BIA Sept. 27, 2018). The BIA explicitly found no prejudice because "the record reflects the respondent was put on notice of the Board's receipt of the DHS's [Notice of Appeal], as indicated by the briefing schedule sent to the respondent by the Board." *Id*. The Board has consistently ruled along these lines. *See In Re Mu Yong Henry*, No.: AXX XX2 072, 2003 WL 23508663, at *1 (BIA Dec. 24, 2003) ("The respondent's request that the DHS's appeal be dismissed because the DHS made an error on the date stated in the certificate of service is denied. The respondent received a copy of the appeal notice on the same date that the original was received by the Board, and has failed to exhibit any prejudice from the apparent typographical error."); *In Re: Jean Volgly Carson Remy*, No. : AXX XX9 270, 2003 WL 23508719, at *1 (BIA Dec. 8, 2003) (noting that a certificate of service which contained incorrect information did not invalidate proceedings because the appellant "has not identified prejudice flowing from" the clerical error."); *In Re: Jose Pedro Reyes-Frisby*, No. : AXX XX3 446, 2006 WL 3203510, at *1 (BIA Oct. 2, 2006) ("Absent truly contumacious conduct on the part of the DHS, it is not appropriate for an Immigration Judge to terminate otherwise-valid removal proceedings with prejudice as a punitive sanction for defects of service that can be easily remedied by other means without substantial prejudice to the court or any party."); *Matter of Rosales Vargas & Rosales Rosales*, 27 I. & N. Dec. 745, 753 (BIA 2020) (referring to certificate of service rules as "internal docketing rules, or procedural or venue

34

provisions" and that "lack of compliance with this portion of the regulation, standing alone or read with the other regulations, does not provide a reason for" adjudicating cases regardless of the merits.); *See also In Re Jorge Tadeo Carrera Hernandez,* 21 I. & N. Dec. 224, 226 (BIA 1996).

Again, the service certificate in question here would simply have noted that separate service is not required because all parties are using the electronic filing system, ECAS. In any event, Petitioners corrected the filing deficiency hours after the Board informed them of it.[14] For these reasons Petitioners have a very high likelihood of success on the merits of their challenge to the Board's summary dismissal order.

---

[14] The Fifth Circuit and U.S. Supreme Court have held that a court abuses discretion when it does not allow a party the opportunity to fix clerical or technical errors in instances such as this: "In the absence of any bad faith or undue delay on the part of the plaintiffs or undue prejudice to the defendants, the district court therefore abused its discretion by not allowing the plaintiffs an opportunity to amend." *Miller v. Stanmore*, 636 F.2d 986 (5th Cir. 1981). This rule of law applies to administrative proceedings: "[P]rocedural perfection is not required unless it affects the substantial rights of a party." *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012). Respondents made an immediate, good-faith effort to fix the technical deficiency, which did not prejudice the government in any way. The substantial compliance doctrine further militates against DHS's position here. "The doctrine of substantial compliance may support a [party's] claim where he or she acted in good faith and exercised due diligence but nevertheless failed to meet a regulatory requirement." *Izen v. Commissioner of Internal Revenue*, 38 F.4th 459, 462 (5th Cir. 2022). *See also Magnussen v. Russian Federation*, 247 F.3d 609, 617 (5th Cir. 2001) ("substantial compliance . . . coupled with actual notice, can suffice to meet the statutory service requirements" in suit against foreign state.). The doctrine of harmless error also undermines DHS's position. *Maredia v. Gonzales*, 232 Fed. Appx. 413, at *4 (5th Cir. 2007) (rejecting a party's argument that "technical procedural defects attendant to his immigration proceedings" could be outcome determinative "because he has not made an initial showing of substantial prejudice.").

### 3. The BIA Practice Manual Makes Clear that Summary Dismissal Is Not Appropriate Where a First Motion to Extend Briefing Schedule is Timely Filed

The Motion to Extend the Briefing Schedule was timely filed. The government concedes this. ECF No. 55. The BIA Practice Manual differentiates between briefs that were "improperly filed," Chapter 3(c)(ii), and those that are "untimely," Chapter 3(c)(iii). The Practice Manual also states that "it is the Board's policy to grant one briefing extension per case, if requested in a timely fashion," Chapter 4(c)(1)(B), that a brief is timely filed unless it is filed "*beyond* the deadline set in the briefing schedule," Chapter 4(a) (emphasis added), and that summary dismissal is not appropriate unless the party "fails to explain the failure" to file a brief.

None of those circumstances are present here. The Motion to Extend the Briefing Schedule was filed on April 6, 2026, the date of the deadline. Petitioners were aware of the deadline and filed this motion before the government filed any brief, not in last-ditch reaction. Petitioners provided an explanation for the extension request—that roughly a week-and-a-half before the merits brief was due, another client of Petitioners' counsel was the subject of an unexpected assassination plot that required counsel travel immediately across the country for meetings with security officials to ensure the client's safety and the safety of her family. ECF No. 55-1. Though Petitioners filed the extension request at a reasonable hour in the afternoon,

the Board did not notify Petitioners of the clerical error until the next day, beyond

the deadline. Had the Board informed counsel, they would have fixed the clerical

error and included a certificate of service stating that service was not necessary. In

any event, when the Board did notify Petitioners, the issue was fixed within hours.

ECF No. 55-3. The summary dismissal violates the Board's own practice manual.

### C. Removing Petitioners Without Any Merits Review of Their Claims to Relief from Deportation Would Violate Their Rights Under the Fifth Amendment's Due Process Clause

Allowing the government to remove Petitioners from the United States

without any court having heard the merits of their applications for asylum,

withholding of removal, and CAT protection would constitute a significant violation

of their due process rights.

"An essential principle of due process is that a deprivation of life, liberty, or

property 'be preceded by notice and opportunity for hearing.'" *Cleveland Bd. of

Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover

Bank & Trust Co.,* 339 U.S. 306, 313 (1950)). The opportunity to be heard is a "'root

requirement'" of due process. *Id.* (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379

(1971)). Noncitizens have statutory, regulatory, and constitutional rights to present

all material evidence and arguments at impartial proceedings. 8 U.S.C. §

1229a(b)(4); 8 C.F.R. § 1240.1(c); *Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 538

(7th Cir. 2005) (holding due process requires a court to afford an applicant a

reasonable opportunity to present evidence on her behalf). An immigration proceeding violates due process where the challenged practice "might have led to a denial of justice, or there must have been absent an element deemed essential to due process." *Hernandez–Garza v. I.N.S.,* 882 F.2d 945, 947 (5th Cir. 1989).

The Fifth Circuit has explained that "the Supreme Court has repeatedly emphasized that 'the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged.'" *Haitian Refugee Ctr. v. Smith,* 676 F.2d 1023, 1039 (5th Cir. 1982) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)). Rejecting the government's highly technical reading of the type of process required, the *Haitian Refugee Ctr.* Court clarified that the asylum adjudication process "must be conducted . . . in a meaningful manner." (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The Court conducted an analysis of the factors enumerated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) and concluded: "We think it strains credulity to assert that these plaintiffs were given a hearing on their asylum claims at a meaningful time and in a meaningful manner" where technical rules substantially impaired their ability to present their argument on the merits. This is all the more true about withholding of removal proceedings, because withholding of removal is a mandatory form of relief to which Petitioners are entitled as a matter of law if they can establish prima facie eligibility, which they have not yet been given an opportunity to do.

This Court has also stressed the BIA's obligation to consider the merits of an appeal. In *Chike v. I.N.S.*, 948 F.2d 961 (5th Cir. 1991), the Fifth Circuit held that the BIA violated a non-citizen's due process rights when it summarily dismissed a non-citizen's appeal without affording him a fair opportunity to present his arguments through a merits brief. Because immigration authorities "allow an appeal," even where "a mistake deprived him of this opportunity" to present his arguments on the merits, "the Board of Immigration Appeal could not render a decision in accord with the Due Process Clause." *Id.* at 962. The Court explained that "[b]y showing that he was denied the opportunity to be heard before the Board of Immigration Appeal, Petitioner has shown substantial prejudice required to establish due process violations in the administrative context." *Id*. (quoting *Ka Fung Chan v. INS,* 634 F.2d 248, 258 (5th Cir. 1981)). Here, the Board refused to consider the El Gamal family's arguments on the merits and refused to allow them to brief the issues when they submitted their first motion to extend the briefing schedule in a timely manner but without a certificate of service. This constitutes a gross violation of their right to due process. Petitioners made these arguments to the Board, but they were ignored without explanation.

39

> *D. Petitioners Plan to Raise Additional Arguments When this Court Issues a Briefing Schedule, and Petitioners Should Not Be Removed Before the Parties Are Able to Brief the Issues*

Petitioners plan to raise additional arguments when this Court issues a briefing schedule, and in the interest of justice and ensuring Article III judicial review, the executive branch should not be allowed to spirit Petitioners out of the country before this Court has the ability to consider the arguments in briefing and oral argument.

For each of these reasons, Ms. El Gamal and her children are likely to succeed on the merits.

## II.    Petitioners Will Be Irreparably Injured Absent a Stay

A denial of this stay request will result in the removal of five children (ages 5, 5, 9, 16 and 18) and their mother to a country where they will almost certainly be arrested and very likely will face persecution as a result of the international attention that has been brought to their case. A showing of irreparable harm is "dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (internal quotations and citation omitted).

This is not a garden variety removal case in which petitioners argue generally that the harm of removal or family separation merits a stay. Very recently, Ms. El Gamal suffered a serious medical emergency for which she has not yet received medical attention. ECF No. 57, at 2-3; El Gamal Decl. ECF No. 57-1; ER Records ECF No. 57-2; Zeidan Decl. ECF No. 57-3. There is concern Ms. El Gamal might

have cancer or a systemic autoimmune disease requiring urgent diagnosis and treatment. Zeidan Decl. ECF No. 57-3 ¶ 6; Reddy Decl. ECF No. 57-3 ¶ 19. Removing her from the country may have long-term health consequences including causing her untimely death, because medical care in Egypt is substandard and it may be the case that she is not physically capable of flying without substantial risk to her health. Not only would these health issues impact her own life, but her children would be effectively orphaned, because their other biological parent abandoned them and will likely be incarcerated for the rest of his life.

This damage will be exacerbated by the fact that their removal would subject them to a very high likelihood of persecution in Egypt. Their meritorious applications for asylum, withholding of removal and CAT protection have never been adjudicated on the merits. This is particularly concerning insofar as withholding of removal is a non-discretionary form of relief from removal, and that the government simply *may not* deport anyone who is eligible for withholding of removal. Their removal would also foreclose Ms. El Gamal's eligibility for a T-visa by breaking the required physical presence. She has already applied for the T-vias and if approved it will provide her with Lawful Permanent Residency and a pathway to citizenship.

Additionally, if Ms. El Gamal and her children are deported now, an eventual victory on the merits of their petition will ring hollow because ICE has no reliable,

41

fair, or binding policy to ensure their return to the United States if this Court grants their petition for review. While the Supreme Court in *Nken* stated that the burden of wrongful removal is "serious" but not "categorically irreparable," that statement was based on the Solicitor General's express assurance that individuals "who prevail can be afforded effective relief by facilitation of their return along with restoration of the immigration status they had upon removal." 566 U.S. at 435 (citing Brief for Respondent). Subsequent developments, however, showed that the Supreme Court had been misled. *See, e.g.*, *Nat'l Imm. Project v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 722 (S.D.N.Y. 2012) ("When the Solicitor General of the United States makes a representation to the Supreme Court, trustworthiness is presumed. Here, however, . . . it seems the Government's lawyers were engaged in a bit of a shuffle"). Internal Government e-mails produced after *Nken* show there is no "policy and practice" of returning individuals who prevail on a petition for review. *Id*. at 726-30.

Petitioners will suffer irreparable harm if they are removed from the United States to Egypt without their asylum applications having been adjudicated on the merits.

### III.    The Issuance of a Stay Will Not Substantially Injury Respondent nor Be Contrary to the Public Interest

Both the third and fourth factors weigh decisively in the family's favor. *Nken* explains that these last two factors, injury to other parties in the litigation and the

public interest, merge in immigration cases because the Government is both the opposing litigant and the public's representative. 556 U.S. at 435. The Court further noted that the interests of the Government and the public in the "prompt execution of removal orders" is only heightened where "'the alien is particularly dangerous'" or "has substantially prolonged his stay by abusing the process provided to him." *Id*. at 436 (citations omitted).

During the hearing held on April 23, 2026, in the U.S. District Court for the Western District of Texas, counsel for the government failed to indicate any reason why the family's release with ankle monitors for the adults would pose any danger to the public or would cause any injury to the government. Counsel merely stated that the government's interest was in enforcing the immigration laws.

Here, the government has already conceded that the family does not pose a danger to the community. ECF No. 34-1.[15] Counsel for the government conceded this point again during the April 23 hearing. The government's interest in enforcing the immigration laws will be strengthened by allowing them to remain in the United States during the pendency of this litigation, because it is the Article III courts who have constitutional authority to determine whether the executive branch is following the immigration laws or is enforcing them in compliance with the Constitution.

---

[15] The IJ held that "HS has not argued at any time during these bond proceedings, including on appeal, that any of the respondents pose a danger if released." ECF No. 34-1, at 2.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully ask that the Court grant this emergency motion for a stay of removal pending resolution of their petition for review.

Dated: April 25, 2026     Respectfully submitted,

          ***/s/ Eric Lee***
          Eric Lee
          Mich. Bar No. P80058
          ***/s/ Christopher Godshall-Bennett***
          D.C. Bar No. 1780920
          LEE & GODSHALL-BENNETT LLP
          712 H St. NE, Unit 5019
          Washington, D.C. 20002
          Tel: (202) 949-2526
          Fax: (202) 333-6470
          eric@leegodshallbennett.com
          chris@leegodshallbennett.com

          ***Counsel for Petitioners***

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2026, I electronically filed the foregoing Motion for a Stay of Removal with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will send notification of such filing to all counsel of record who are registered CM/ECF users.

Dated: April 25, 2026     ***/s/Eric Lee***
          Eric Lee
          Counsel for Petitioners

## CERTIFICATE OF CONFERENCE

Pursuant to 5th Cir. R. 27.4, counsel for Petitioners certifies that on April 25, 2026, counsel emailed counsel for Respondent regarding the relief requested in the foregoing motion. Counsel for Respondent opposes this motion.

Dated: April 25, 2026
                         */s/Eric Lee*
                         Eric Lee
                         Counsel for Petitioners

## CERTIFICATE OF COMPLIANCE

Pursuant to 5TH CIR. R. 32.2.7(c), undersigned counsel certifies that although this motion goes beyond the type-volume limitations of 5TH CIR. R. 27.4 and Fed. R. App. P. 27(d)(2), the undersigned is simultaneously filing a Motion to Extend Motion Length based on extraordinary circumstances at issue here.

1. Exclusive of the portions exempted by 5TH CIR. R. 32.2.7(b)(3), this motion contains 11,242 words printed in a proportionally spaced typeface.

2. This motion is printed in a proportionally spaced, serif typeface using Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes produced by Microsoft Word.

3. This motion is accompanied by a simultaneously filed Motion to Extend Motion Length, based on the extraordinary circumstances at issue here as well as the complexity of the underlying legal issues involved. The government indicated to the undersigned that it takes no position on the Motion to Extend the Motion Length.

45

Dated: April 25, 2026

*/s/Eric Lee*

Eric Lee

Counsel for Petitioners

46